IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, CHICAGO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND, CHICAGO AND NORTHEAST ILLINOIS REGIONAL COUNCIL OF CARPENTERS APPRENTICE AND TRAINING PROGRAM and LABOR/ MANAGEMENT UNION CARPENTRY COOPERATION PROMOTION FUND, <br><br>Plaintiffs, <br><br>v. <br><br>RINK SYSTEMS, INC. <br><br>Defendant. | No. 13 C 4886 <br><br><br><br><br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

Plaintiff Funds sue defendant Rink Systems, Inc. pursuant to the Employee Retirement Income Security Act ("ERISA") for Rink's alleged failure to make required contributions and produce records to the Funds. The case is before the Court on the Funds' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the Court grants in part and denies in part the motion.

## Facts

The Funds are multi-employer trust funds, each of which is governed by a Trust Agreement, that provide benefits to members of the Chicago Regional Council of Carpenters ("union"). (Def.'s LR 56.1(b)(3)(B) Stmt.¶¶ 1-2.) The Funds collect contributions from employers who have agreed

to be bound by the Trust Agreements and the collective bargaining agreement ("Area Agreement") between the union and employers. (*Id.* ¶¶ 3-5.)

The Area Agreement requires employers to make contributions to the Funds for hours worked by employees and certain supervisors who perform bargaining unit work. (Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 4, Area Agreement §§ 12.1, 12.11, 13.1, 13.9, 14.1, 14.9, 35.1.) The Area Agreement defines the bargaining unit as:

> [A]ll Journeymen, Foremen, Apprentices and Trainees engaged in work at the construction site covered by the occupational jurisdiction of the "UNION" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; concrete forming, gang forms; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all material where the skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools[;] . . . all Journeymen, Foremen, Apprentices and Trainees engaged in work as Carpenters and Joiners . . . ; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or subdivisions, and the handling, erecting and installing material on any of the above divisions or subdivisions . . . .

(*Id.* § 1.1.)

The Agreement requires employers to subcontract with other union employers, and if they do not, to "require [non-union] subcontractor[s] to be bound by all provisions of [the Area Agreement], or . . . [to] maintain daily records of the [non-union] subcontractor's . . . jobsite hours" and make contributions for them to the Funds. (*Id.* §§ 3.2-3.5.) An employer who does not make the required contributions "shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in an amount as determined in accordance in accordance with [the Area and Trust Agreements]." (*Id.* § 12.10.)

2

Each Trust Agreement gives the trustees the right to "enter upon the premises of any employer . . . to examine and copy such books, records, papers and reports" necessary to determine the number of employees performing bargaining unit work, the number of hours of such work performed, the place the work was performed, and whether the employer has made appropriate contributions to the Fund. (Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 5, Pension Trust Agreement, art. VI § 2B; *id.*, Ex. 6, Welfare Trust Agreement, art. IV § 20; *id.*, Ex. 7, Apprentice & Training Trust Agreement, art. VI § 3; *see id.*, Ex. 8, Promotion Fund Trust Agreement, art. 7.3 ("All Employers shall submit to the Fund written reports or documents as the Board of Trustees may deem necessary or appropriate to collect and substantiate contributions.").) Each Trust Agreement also gives the trustees power to assess liquidated damages against any employer who fails to make required contributions. (*Id.*, Ex. 5, Pension Trust Agreement, art. IV § 4, art. VI § 2C; *id.*, Ex. 6, Welfare Trust Agreement, art. IV § 3; *id.*, Ex. 7, Apprentice & Training Trust Agreement, art. VI § 4; *id.*, Ex. 8, Promotion Fund Trust Agreement, art. 7.5.)

Rink, through its president Stacey Overgaard, signed a contract with the union dated October 1, 2011 agreeing to be bound by the Area and Trust Agreements for "all carpentry work [Rink] performed at . . . Cicero Community Ice Center." (*Id.*, Ex. 1, One Jobsite Agreement ¶ 1.) Rink hired Kendale Subcontractors, a sole proprietorship run by Ken Weaver, to work on the Cicero project but did not ask Weaver to sign the Area Agreement. (Pls.' LR 56.1(a) Stmt., Ex. J, Weaver Dep. at 11-15; *id.*, Ex. E, Stacey Overgaard Dep. at 55-57.)

Weaver and two other Kendale employees, Ryan Riley and Megan Keefer, worked on the Cicero job along with two union carpenters, Ricardo Valenciana and Nick Carreto. (*Id.*, Ex. J, Weaver Dep. at 24-26; *id.*, Ex. M, Valenciana Dep. at 7-11.) Weaver and Riley joined the union for

3

the Cicero job; Keefer did not.  (*Id.*, Ex. J, Weaver Dep. at 19-21.)  Scott Overgaard, Stacey's brother and a co-owner of Rink, supervised the work.  (*Id.* at 28-30; *id.*, Ex. E, Stacey Overgaard Dep. at 8-9, 33-34.)

The Cicero work was done in two phases, the first from October 24-28, 2011, and the second from December 6-9, 2011.  (*Id.*, Ex. J, Weaver Dep. at 26, 34.)  Weaver, Riley and Keefer each worked seventy-two hours on the Cicero project; forty hours in October, and thirty-two hours in December.  (Def.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 32-33.)  Rink reported Weaver and Riley's hours to the Funds and made the required contributions for them.  (*Id.* ¶ 41.)  It did not report or make any contributions for Keefer and Scott Overgaard's work on the Cicero job.  (*Id.* ¶¶ 42, 46.)

The Funds allege that Rink breached the Area and Trust Agreements by failing to require Kendale to sign or abide by the Area Agreement, failing to pay contributions for Keefer and Scott Overgaard, and failing to produce records for audit.

## Discussion

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At this stage, we do not weigh evidence or determine the truth of the matters asserted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  We view all evidence and draw all inferences in favor of the non-moving party.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party.  *Id.*

There is no dispute that Rink agreed to be bound by the Area and Trust agreements, which require employers to: (1) subcontract with other union employers; or (2) require non-union subcontractors to abide by the provisions of the area agreement; or (3) maintain daily records of the hours worked by non-union subcontractors and make contributions for them to the Funds. (Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 1, One Jobsite Agreement; *id.*, Ex. 4, Area Agreement §§ 3.2-3.5; Def.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 10-11.) There is also no dispute that Rink subcontracted with Kendale but did not ask Weaver to sign or abide by the Area Agreement. (Pls.' LR 56.1(a) Stmt., Ex. J, Weaver Dep. at 15.) The Funds contend that Rink was also required to report and make contributions for Keefer's hours on the Cicero job.

Rink says that Keefer worked on the Cicero job as a helper, which is not bargaining unit work, and thus no reports or contributions were required. Rink's argument is based on the structure of the bargaining unit provision, which defines the unit in two separate sentences:

> The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices and Trainees **engaged in work at the construction site** covered by the occupational jurisdiction of the "UNION" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; concrete forming, gang forms; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all materials where the skill knowledge and training of the Employees are required, either through the operation of machine or hand tools. The Bargaining Unit shall also consist of all Journeymen, Foremen, Apprentices and Trainees **engaged in work** as Carpenters and Joiners, Millwrights, Pile Drivers; Bridge Dock and Wharf Carpenters, Divers, Underpinners, and Timbermen and Core Drillers; Ship Wrights, Boat Builders and Ship Carpenters, Joiners and Caulkers, Cabinet Makers, Bench Hands, Stair Builders, Millmen, Wood and Resilient Floor Layers, and Finishers, Carpet Layers, Shinglers, Siders, Insulators, Acoustic and Dry Wall Applicators; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Casket and Coffin Makers; Furniture Workers, Reed and Rattan Workers; Shingle Weavers, Box Makers, Railroad Carpenters and Car Builders, and Show, Display and Exhibition Workers and Lathers, regardless of material used; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or

5

manufacturing of products used in the trade, **or engaged as helpers to any of the above divisions or subdivisions;** and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, welding, rigging and the use of any instrument or tool for layout work, incidental to the trade. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the Trade. . . .

(*Id.*, Ex. A, Libby Aff., Ex. 4, Area Agreement § 1.1) (emphasis added). Because the only reference to job site work is in the first sentence, Rink argues that the job site work performed by the employees listed in the second sentence is not bargaining unit work.

The Court disagrees. Read in the context of the Area Agreement as a whole, it is clear that the second sentence of the bargaining unit provision sets forth the job classifications that perform the work described in the first sentence. *See Chi. Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc.*, 270 F.3d 1060, 1069 (7th Cir. 2001) ("The reasonableness of a proposed interpretation of contractual language requires consideration of the contract as a whole . . . ."). For example, the Agreement states that the pile drivers' scope of work includes: (1) "jobsite erecting and dismantling of derricks"; (2) "jobsite loading, unloading and distribution of all pile driving equipment"; (3) "jobsite maintenance of pile driving equipment"; (4) "jobsite preparation of all barges"; and (5) "jobsite positioning, repositioning, flooding, [and] refloating . . . of watertight midsection hulls." (Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 4, Area Agreement § 22.1.) If, as Rink contends, pile drivers are only in the bargaining unit when they are not working on a job site, this provision would be meaningless. The same is true for the provision setting work rules for millwrights, which requires employers to reimburse millwrights for expenses they incur "travel[ing] to a jobsite," and the scope of work for lathers, which claims "prefabrication . . . of furring iron and metal lath, whether fabricated on the job or in a warehouse" as part of their jurisdiction. (*Id.* §§

23.5, 26.6.) Because Rink's interpretation of the bargaining unit provision does not comport with the other provisions of the Area Agreement, the Court rejects it.

Viewed favorably to Rink, the record establishes that Keefer was, at least, a carpentry helper on the Cicero job. (*See* Pls.' LR 56.1(a) Stmt., Ex. M, Valenciana Dep. at 25, 29, 32, 36, 47-48, 65-67, 72 (testifying that Keefer did the same work as he, Carreto, Weaver and Riley did on the Cicero job); *id.* at 78-81 (saying that Keefer "did everything we did," she "was equal to all of us," and she "helped [Valenciana and Carreto] out a lot because it wasn't her first rink"); *id.*, Ex. J, Weaver Dep. at 29-32 (testifying that during the first phase, Keefer gathered the necessary tools and hardware for Weaver and Riley and generally "prepp[ed]" for the installation); *id.* at 51 (agreeing that it was "fair to say that [Keefer] was, at a minimum, . . . a helper" to the carpenters); Def.'s LR 56.1(b) Stmt., Ex. 1, Carreto Dep. at 24, 35, 37-38, 48 (saying that Keefer did the same work as the male carpenters); *id.* at 40 (agreeing that "it [is] fair to say . . . [Keefer and the men] all pretty much did the same work").) Because the record establishes that Keefer did bargaining unit work on the Cicero job, Rink's admitted failure to report and make contributions to the Funds for her hours breached the Area and Trust Agreements.

The Funds also allege that Rink was required to make contributions for Scott Overgaard's work on the Cicero job. In relevant part, the Area Agreement provides:

> The EMPLOYER shall make contributions on behalf of each of its Employees employed . . . in a management of [sic] supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than one hundred and sixty (160) hours per month.

(Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 4, Area Agreement §§ 12.11, 13.9, 14.9.) There is no dispute that Scott Overgaard worked as a supervisor for Rink on the Cicero job. (Def.'s LR

56.1(b)(3)(B) Stmt. ¶ 44.) But there is a genuine issue of fact as to whether he performed bargaining unit work. (*See* Pls.' LR 56.1(a) Stmt., Ex. J, Weaver Dep. at 28 (testifying that Scott Overgaard "did a lot of customer service and interacting with . . . visitors [to the Cicero job]," "helped out whenever needed . . . as an extra set of hands[,] . . . coordinated the work . . . and just made sure the job was running smoothly"); *id.* at 49 ("[Scott Overgaard] was Rink Systems' representative on the job that dealt with the owners and the customers of the rink."); *id.*, Ex. M, Valenciana Dep. at 24-25, 31-32 (stating that Scott Overgaard did the same work as the carpenters); *id.* at 68-69 (stating that Scott Overgaard "help[ed] out a little bit, but not a lot"); *id.* at 78 (same).) Thus, the Court denies the Funds' motion for summary judgment on their contribution claims for Scott Overgaard's work.

The Funds also allege that Rink failed to produce records as required by the Agreements. (*See* Pls.' LR 56.1(a) Stmt., Ex. A, Libby Aff., Ex. 1, One Jobsite Agreement ¶ 4; *id.*, Ex. 5, Pension Trust Agreement, art. VI § 2B; *id.*, Ex. 6, Welfare Trust Agreement, art. IV § 20; *id.*, Ex. 7, Apprentice & Training Trust Agreement, art. VI § 3; *see id.*, Ex. 8, Promotion Fund Trust Agreement, art. 7.3.) The Agreements do not, however, say how or when the records must be produced. Moreover, viewed in Rink's favor, the record suggests that: (1) it "provided partial records," after the Funds' first request, the date of which is not stated in the record; (2) on June 4, 2013, the Funds demanded that Rink provide more documents within ten days, though none of the Agreements contains a production deadline of that or any other length; (3) Stacey Overgaard and/or Rink's attorney were in contact with the Funds' auditors throughout the summer of 2013; and (4) shortly after October 14, 2013, Rink produced all remaining documents. (Pls.' LR 56.1(a) Stmt. ¶ 22; *id.*, Ex. D, Letter from Funds to Rink (June 4, 2013); *id.*, Ex. E, Stacey Overgaard Dep. at 58-64; Def.'s LR 56.1(b)(3)(B) Stmt. ¶ 28.) Because the record does not establish what documents the

Funds requested from Rink, when the Funds made the requests, what documents Rink produced or when Rink did so, the Court denies the Funds' motion for summary judgment on their audit claims.

**Conclusion**

For the reasons set forth above, the Court grants in part and denies in part the Funds' motion for summary judgment [24]. The motion is granted as to the Funds' breach of contract claims based on Rink's failure to report and make contributions for the hours worked by Megan Keefer on the Cicero job. The motion is otherwise denied. Filing the final pretrial order in open Court, is set for September 22, 2014 at 10:00 a.m.

**SO ORDERED.**　　　　　　　　　　　　**ENTERED:  August 21, 2014**

_Ronald A. Guzman_
_____
**HON. RONALD A. GUZMAN**
**United States District Judge**